## EARNSHAW v. McHOSE et al.

### (Circuit Court of Appeals, Third Circuit. June 16, 1893.)

CHARTER PARTY—DISPATCH MONEY—CONTRACT OF SALE—INTERPRETATION.

A contract provided that the plaintiff should sell, and the defendants buy, iron ore, at named prices, and stipulated that these prices "were based on an ocean freight rate of 12 shillings a ton," all freight over that sum to be added to, and all freight less than that sum to be deducted from, the invoice price. Plaintiff chartered a vessel at that rate, agreeing with it in the charter party for £15 dispatch money and £30 demurrage for each day to be saved from or exceeding the number of days allowed for loading or unloading. Dispatch money was deducted from the amount

paid for freight, which defendants claimed should be deducted from the invoice charge. *Held*, in the absence of any unusual expenditure by plaintiff to secure dispatch, the dispatch money was merely a deduction from the freight, and must be allowed on the invoice price. 48 Fed. Rep. 589, affirmed.

In Error to the Circuit Court of the United States for the Eastern District of Pennsylvania.

At Law. Assumpsit by Alfred Earnshaw against Isaac McHose, Ambrose A. McHose, and Wilson V. McHose, trading as Isaac McHose & Sons. There was a special verdict for plaintiff, and motions were made to increase and diminish the amount of the verdict, but were overruled, and judgment entered thereon. See 48 Fed. Rep. 589. Plaintiff brings error. Affirmed.

R. C. McMurtrie, for plaintiff in error.

Frank P. Prichard and John G. Johnson, for defendants in error.

Before DALLAS, Circuit Judge, and GREEN and WALES, District Judges.

WALES, District Judge. This was an action brought in the circuit court of the United States for the eastern district of Pennsylvania to recover a balance of money due on several cargoes of iron ores which had been sold and delivered by the plaintiff to the defendants under a contract made between the parties on the 20th day of January, 1890. The ores were shipped from Marbella, Spain, to the port of Philadelphia. The terms and conditions of the contract which relate to the present controversy are these:

"(1) Price to be at the rate of seven dollars and eighty cents ($7.80) per ton, of 2,240 pounds, for the mined ore, commonly known as 'Marbella Lump,' and seven dollars and forty cents ($7.40) for the sand ore, commonly known as 'Marbella Sand.'

"(2) Freight rate. The above prices are based on an ocean freight rate of twelve shillings per ton; all freight over twelve shillings to be added to the invoice as part of the price of the ore, and all freight under twelve shillings to be deducted from the invoice."

After he had made this contract with the defendants, the plaintiff obtained charter parties from different shipowners for the transportation of the ores to Philadelphia. Each of these charter parties contained the same stipulations as to freight, lay days, quick dispatch, and demurrage, being, in substance, as follows: (1) Freight to be paid at the rate of 11 shillings and 6 pence per ton, of 2,240 pounds. (2) The cargo to be loaded at the rate of 250 tons, and discharged at the rate of 250 tons, per day. (3) Charterer to have the option of averaging days for loading and discharging, in order to avoid demurrage. (4) Dispatch money, at the rate of £15 per day, of 24 hours, for any time saved in loading or discharging. (5) Demurrage over and above said lay days, at the rate of £30 per day, except in case of any unavoidable accidents which may hinder the loading or discharging.

At the trial it was proved that the loading and unloading of the chartered vessels were always within the lay days, so that the vessels were always loaded and unloaded at a more rapid rate than 250 tons a day. The dispatch money credited by the ships on plain-

tiff's bills of freight amounted to about 24 cents a ton; but this credit was not allowed by the plaintiff to the defendants in reduction of the price of the ores. The defendants claimed that, under the contract of January 20, 1890, they should be allowed this difference between 12 shillings freight per ton and the amount actually paid by the plaintiff, and the learned judge of the circuit court, in charging the jury on this point, said:

"The dispatch money, referred to in the point, is a rebate or drawback upon the freight stipulated for in the charter between the vessel carrying the ore and Mr. Earnshaw, as an allowance for quick dispatch in loading and unloading. The charter named certain lay days, and the freight specified was based upon this extent of detention, with a provision for a rebate in case of earlier dispatch of the vessel than was stipulated for by the charter, from the respective ports on this side and the other. It was found unnecessary to detain the vessel the length of time named, and a rebate was made accordingly from the freight specified. The plaintiff was not subjected to any charges in obtaining the rebate, and I am therefore impressed with the belief that the same should properly be deducted from the amount of freight charged."

In obedience to this instruction, the jury found for the plaintiff in the sum of $45,593.77, with the special statement that this was the sum due to the plaintiff after deducting $13,926.24, which had been allowed to him for dispatch money. To this instruction the plaintiff excepted, and it has been assigned for error here.

The question for decision is to be determined by the meaning of the contract in relation to the prices to be paid for the ores. These prices were fixed at certain sums, provided the ocean freight rate should be no more or less than 12 shillings a ton; but, if the freight rate should be over 12 shillings, the excess should be added to the invoice part of the price of the ore, and, if under 12 shillings, the difference should be deducted from the invoice. This part of the contract, standing alone, appears to be plain enough, and is easily understood. The freight which was actually paid by the plaintiff was less than 12 shillings, and it was for him to explain why the defendants should not have the benefit of the reduction on the price of the ore. This he has failed to do. He was put to no extra cost, nor did he incur any additional personal labor, in obtaining the dispatch money. He had contracted to deliver the ores at Philadelphia, and it was his duty to provide the necessary number of ships to receive their cargoes, and transport them to the port of destination. For this work he was entitled to no compensation from the defendants. His profits were to be made out of the sale of the ores, and he was not at liberty to speculate, directly or indirectly, in the chartering of the ships. If any advantage or credit was to be gained by a reduced freight rate, no matter how secured, the defendants were to have the benefit of it. The attempt to show that the plaintiff had, at some former period, expended considerable money and time in providing means and appliances for rapidly loading and discharging cargoes did not justify him in appropriating to himself the rebate allowed for quick dispatch. Whatever improvements he may have made for the purposes were not limited to the loading and discharging the ores sold to the defendants, and were not therefore chargeable against

the latter. It certainly could not have been the intention of the parties that the plaintiff was to make a profit on the freight, as well as on the ores. At least, such could not have been the understanding of the defendants, nor can it be implied from any reasonable interpretation of the contract. It is true that no fraud has been imputed to the plaintiff in making the arrangement for a rebate in the form of dispatch money, but it is not difficult to conceive how such an arrangement might be made use of to the injury and loss of an ignorant or innocent vendee.

The freight was based on a voyage which included the time consumed in going from port to port, and also an arbitrary number of days (lay days) in each port for loading and unloading, which latter were to be ascertained by dividing the tonnage of the cargo by 250. If a less number of days was consumed in each port, an allowance was to be made of £15 for each day thus saved. The dispatch money is paid for getting the ship clear of her cargo sooner than the charter party calls for. It is the price paid for not keeping the ship as long as the shipper is entitled to keep it, being in the nature of a premium for loading and unloading the cargo in less than the allowed time, so that the ship can make more frequent voyages and earn more freight. The number of lay days is fixed by the shipper and the owner of the vessel, and for each day saved the owner allows a rebate on the freight. This is for the mutual advantage of the shipper and the owner. Now, in the absence of any particular outlay of money or of exertion on the part of the plaintiff, why should he be permitted to retain the credits on his freight bills? If the shipowners were to be benefited by quick dispatch, so was the plaintiff, since the more promptly he delivered the ores the less delay there would be in receiving his payments from the defendants. It was to his interest that he should realize on his sales with the least possible delay.

We have given due consideration to the argument of the plaintiff's counsel, but can find no ground for modifying the conclusion at which we have arrived.

The judgment of the circuit court is affirmed.